Good morning, everyone.We're ready to proceed. I do want to note before we begin, though, I'd like to note the presence of Judge Patty Schwartz, the newest member on the Third Circuit Court of Appeals.We are very fortunate and most happy to have her. Thank you so much.Thank you. First case, GagerversusDell Financial Services. Mr. Flitter.Yes, Your Honor. Good morning.May it please the Court, Kerry Flitter for the appellant, Ashley Gagervers, with me at counsel table, Carlo Sabatini. I should like to reserve four minutes for rebuttal if I may. Yes. The TCPA, the Telephone Consumer Protection Act, is a piece of remedial legislation that focuses on contacts with consumers by the use of various telephone methods. But isn't it mostly telemarketers? It does restrict telemarketers, Your Honor, but by no means is it exclusively telemarketers. And, in fact, the section that we are proceeding under, the statutory section, is the one that pertains to calls to wireless phones. That's actually a different section than the call to landlines. Doesn't that also apply to telemarketers? Yes, it does. But this is not a telemarketer circumstance. It is not. So how does that provision apply? Because the section that we're dealing with, which addresses the use of ATDS, automatic telephone dialers, to cell phones or wireless service is its own section, and it applies to both telemarketing and debt collection and other calls. The Federal Communication Commission that has regulatory authority over the matter has said so in its 2008 ruling and in other places across the way. So while there are provisions that apply to telemarketers and there are provisions that don't cover debt collectors, they are not the ones that cover wireless. ATDS calls to cell phones has its own section and own set of restrictions that the FCC has said applies across the board, regardless of the content of the call, according to the Commission's 2008 ruling. So your client's complaint is only about auto-dialing to her wireless and nothing else? Only. But the FCC, go back to that one point, the FCC has explicitly said that that section does indeed apply in a creditor-debtor circumstance. Yes. In fact, in the 2008 application, the ACA, which used to stand for the American Collectors Association, asked for a ruling that their calls were not going to be covered, and the Commission declined to do that and said that while there are certain prescriptions that deal with telemarketers that will not cover debt collection, ATDS automatic dialer calls to cell phones are still covered and they are still restricted. And that's significant because wireless and ATDS, if I can take one minute, ATDS, these automatic dialers, back in the day someone would dial a telephone number. You can load thousands of numbers into these auto-dialers and they can literally place hundreds and thousands of calls in the space of minutes. The call will ring. The consumer will pick up the phone. There's no one there. It's probably happened to all of us at some point. Hello, hello. And there's software that a collector will see when the light goes on, it's a live voice, and then after two or three or four seconds you'll get a voice. And then you hang up. Yes. And then you hang up. Unless it's from, there's others that use that technology, political parties and charitable. Well, you hang up on them too, I think. Yes. So I think because of the fact that the technology has the capability for such widespread calling, and particularly because of the fact that in the case of wireless phones, you have two things you don't have with a landline. Number one. Let me focus on that for one second. Is there a problem that your client is being called on her cell phone? Would you have the same problem if she were called on a landline? I don't know that the Federal Communication Commission has spoken to revocation of consent on a landline. I think I'd have a harder argument. She resented to being called, period. She didn't say, you can call me on this phone or that. Right. She said, okay, you can call me. She said that on her application. Effectively, sir. I will note that this is an odd animal. My question would be, would she have the same problem? If the same 40 calls in a period of three weeks were made on her home landline, would you have the same problem? I would, but I think the regulatory framework wouldn't be as clear. The FCC and the Act speak so clearly. There's a separate section on auto dialers and cell phones, and that's what I was going through a minute ago. Why it's so crucial here that it was calls to cell phones is, number one, the Commission has found they're inherently more invasive. You carry them with you everywhere. It's not just a home phone. It might be for somebody else. And the second thing is the cost. I understand. I've been called on my cell phone in the most inconvenient places you can imagine. Like when it's hanging on the back of the door in the women's room. I guess you've never had that. No, I can't speak to that. No, but she never said to Dell Financial Services, you're calling me on my cell phone. She sent a letter seeking to revoke her consent to being called, but she never said, you are calling me on my cell phone. That is true. She provided the only number that she had. Like so many, and with my gray hair I can say so many young people, they only had a cell phone. I think the Commission has found that for the first time there's more people in cell phone-only homes than in landline-only homes. In other words, they called her on the one and only phone that she provided on her credit application. The FCC has said that's not a defense, and I would answer that in two ways, sir. The first is that in the 2003 ruling, the FCC declined to adopt a, I'll call it a good faith defense. It's strict liability. If you call on a cell phone and it's forbidden, you violated the act. And the reason for that is that there is software readily available in the marketplace where the caller can find out instantly if it's a cell phone number. The example we make in the briefs is what's called porting. A lot of people are getting away from landlines, but they say I've had that number for 10, 15, 20 years, and they can port that number onto their cell phone number. The Commission says, well, the callers have a 15-day window within which to scrub all the accounts that they're going to call, because they can find out readily if it's wireless service. And within the 15-day window, they have to determine for themselves if it's a wireless number. So with regard to what she told Dell or what Dell subjectively knew about the calls, I would say that at most that's an issue that goes to willfulness under the act. It does not go to whether we state a claim. The Commission has said that you may not use ATDS wire calls or ATDS auto dialers to cell phones without prior express consent. What she gave her consent? Well, according to the Commission, when you provide your telephone number on an application, that is deemed prior express consent. And the Commission uses terms like effectively gives her prior express consent. We pled below that she gave prior express consent. But I have to ‑‑ I don't like using air quotes, but I have to use air quotes around prior express consent. Dell never told her they would use an auto dialer. They never said they might call 40 or 400 times in the space of a period. They never said that it would be consent for life. All she did was put her phone number on the application. But she never said I'm not going to continue to pay the bill either. She never, and of course not. And I should add, if I go a wee bit beyond the record, she paid that bill for over two years. And the evidence would show that, you know, she had a problem pregnancy, lost her job as a ‑‑ had to quit her job for three months as a nurse and was unable to make ongoing payments. And that happens to an awful lot of Americans. But I agree, Your Honor, of course she didn't say that. But she was good pay on this account for a long time. You mean she didn't ‑‑ she gave a consent, but she gave an ‑‑ what's it called? An express consent? Well, so ‑‑ But she didn't condition it on any factor? Well, again, I get that. An express consent? I don't know. An implied consent? And that was my use of the air quotes. From the language of the Act and the regulation, the 641200, it's deemed prior express consent. But I don't think you can divorce it from what actually happened. There was no disclosure on the agreement that you may be called X number of times, that we'll use an auto dialer, that we will not stop, that it's for life, that you're agreeing to be called for life. Del never said any of that. So while she did give express consent in law, I think that the facts of this case really are in the consumer's favor because Del should have but did not explain what the nature of the consent was. There'd be no reason for her to condition it on anything. And with an online application, I don't think that's really feasible. The SEC has addressed that, hasn't it? It has said that when you do indeed provide a telephone number, you are given prior express consent. Yes. You can be contacted with respect to the debt. And we never said that she didn't give, quote, prior express consent, close quote. I'm simply saying that it's consent implied in law. And when you look at the circumstances of what is the consent, of what did she consent to, she consented to be called. The real issue here today, the case was thrown out because Judge Mariani below, in the first decision of its kind, held that the consent is irrevocable for life, that there's no provision in the regulation or the statute that says you can ever revoke it. Well, it's a valid until the debt is paid, I suppose. Well, we would not agree with that, sir. Respectfully, that's really why we're here. So when can you revoke consent and how? Right. Well, the court cases, if I can answer that in two ways, sir, there's the court decisions and there's the FCC. The court decisions that have addressed it, there's been a half a dozen of them or more, have all held that you can revoke consent. The issue has been, need it be oral or must it be written? May it be oral or must it be written? Before this case, there was never a court had held that the consumer couldn't revoke consent. May I ask you this? If she gave express consent when that contract was made, of course, if she hadn't given consent, she wouldn't have gotten the computer. There would be no contract. They would have said forget it. So let's take it this way. Supposing on the day that she got the contract, she signed her consent. The next day she gets the computer, she's very happy, I got my computer. Two days later, according to your theory, she can send a letter in and say I don't want you to call me on my number. That would be your theory. Yes, sir, but I want to emphasize the only thing she would be revoking is consent for an auto dialer to call her cell phone. They all can still call her manually. They can have a collector call her. They can write her letters. They can sue her. They can put her on a credit report. We're only dealing with this because the act and the commission has put this auto dial calls to cell phone because of the expense and the multiplicity of calls as an extremely inconvenient means that's burdensome to the consumer. Does she have a condition in the contract on not being auto dial called? You know, there's nothing in the ‑‑ it was an online contract. There was no box to check off, don't use auto dialers. And I do want to address the sound bite decision, but I see my red light is on. We'll get you back with a rebuttal. Thank you, sir. Your Honors, good morning, and may it please the court. My name is Anthony Gaglia, and I represent the appellee, in this case, Dell Financial Services. Your Honors, the court hit the nail on the head with its first question to Mr. Flitter, and that was, this isn't a telemarketing case, is it? The answer to that question is no, and the answer is, therefore, dispositive, because the Telephone Consumer Protection Act was enacted for the exact reason of preventing unwanted telemarketing solicitations. For example, when the phone is in your jacket hanging on the back of a stall. It, however, did not exempt or was meant to preempt in any way legitimate business contacts with customers. Is this a legitimate business contact with customers, though, when Dell Financial Services places 40 calls in a period of three weeks? I don't think that's contested. That's two calls a day on a cell phone. Your Honor, it is a legitimate business purpose. In fact – But it's not the only way that they can contact Ms. Kager in order to try to collect on the debt. They can have a person call her. They can have a bill collector call her. As your worthy opponent said, there are a whole slew of different ways to collect on the debt. So why is having this auto-dial possibility so important to you, particularly since I think most people hang up when they realize what the call is? That's possibly one option, Your Honor, but the reason that it's so important is because that's the way this particular business, and many businesses like it, conduct business in these instances. But, okay, it's the way they want to, but it's not the only way they should. Well, that's correct, Your Honor, but – And the pervasiveness and the invasiveness of these automated calls to cell phones is such that – and it's not limited to telemarketing – led Congress to enact this law, which says that you can't do it with a cell phone. And if she has expressly consented to it, is she bound for that forever and ever? That is what I find very hard to believe because consent is something which is easily revoked in a legal connotation unless there is express conditions otherwise, and the express consent here does not contain any such conditions. Well, Your Honor, to answer your question, does it go on forever and ever, as Mr. Flitter said, the answer to that is no. It goes on so long as the business relationship with the entity exists. For example, Ms. Gager applied for credit on the credit application. She provided her cell phone number in spite of the fact that the application itself said, do not list a cell phone. And then Ms. Gager spent thousands of dollars, which for one reason or another – those facts are not in the record – she did not pay. Had she simply paid off her account, she could have canceled that account, but she couldn't pay off that account. In one particular instance, Your Honor, but had she paid off the account, she could have canceled it. Another option, Your Honor, as what's happened in this case, she filed for bankruptcy. At that point, those calls stopped, so her consent is revoked. And another time, Your Honor – and by the way, the FCC specifically speaks to this – she could have provided instructions to the contrary at the initiation of the relationship. And then they wouldn't have made the loan. Well, but that's the whole point, Your Honor. They may have or they may not have, but it's so important, and that's what the FCC is saying in the business context. Not in the telemarketing context, but in the business context. If you do not want to be called, you should say so up front. Well, she's not saying she didn't want to be called. She's saying she didn't want to be called. The revocation is saying, I don't want to be called with this automatic machinery. They can still pick up the phone and say, hey, Ms. Gager, come on, let's pay this bill, right? They could do that, Your Honor. And the collector could do the same thing. Well, Judge, I don't know the answer to that question because – Well, of course they could. Well, according to Mr. Flitter's argument, though, the quote-unquote revocation that she provided said, do not contact me about my account. So does that give a debt collector a reason to call? I don't know. They might be here under the Fair Debt Collection Practices Act. Had she said, do not contact me about my account, which she did, and then a debt collector contacts her, or Dell, someone picking up the phone, calling her, we'd still be here. That's the whole point. Is there any limit to the auto-dialing? I mean, is there a point where you can say enough is enough? If you can say 100 calls or 200 calls in a period of three weeks, 40 to me seems like quite a bit. I mean, is there any point you can reach, or is there no limit to the kind of auto-dialing that was involved here? Your Honor, the FCC has not spoken to that issue in terms of how much is too much. Then maybe a consumer can say, you know, just don't do it anymore. Don't call me anymore. Why isn't that enough? Well, Your Honor, what's so important in this area? It's not the only remedy the consumer has. Well, but what Mr. Flitter, he cited to the 2008 FCC ruling, and he cited it many times, but respectfully, what he was saying to this Court is simply wrong, because what the FCC has said, by the way, what Your Honors are hinting to was that many commentators, when the FCC was interpreting the TCPA, when the TCPA was being enacted, said exactly what Your Honors are saying. Don't make a distinction between telemarketing and other legitimate business purposes. And the FCC was mindful of that, and they said, we know that many commentators expressed concern about obtaining written consent for certain types of auto-dialed or pre-recorded calls, including debt collection calls. Go back to Judge Ross' point that I thought that she was making. Why can't you revoke your consent? I mean, when you give consent, it doesn't mean I'm giving permanent forever and ever consent. Your Honor, it does in this instance. In a common law scenario, that wouldn't be true, would it? Your Honor, when we're interpreting the statute. We're talking about the common law. The question is the common law. All right. Answer that question. Well, to answer that question, we're not bringing into common law into the interpretation of the statute. Answer the question about the common law. Your Honor, I don't know the answer to that question, because it hasn't been an issue in this case, and we aren't arguing. Of course it's an issue in this case. We're dealing with consent. We're dealing with consent under a statute, but as judges, we can't simply look at the language of the statute. We've got to look at the context in which it's placed. And one of the things we consider in our deliberations is the common law and how the common law deals with consent. And it seems to me that you ought to be in a position to discuss the common law, and please do so. Your Honor, in the telemarketing context, consent can be revoked. Okay. In the common law context, consent can be revoked. In the telemarketing context, when you deal with business relationships. I'm not talking about telemarketing. We're talking about debt collection and common law. Your Honor, and I'm trying to speak to that. What common law notions of contract say is if I extend something to you, an offer, and you extend something to me, consideration, we have a contract. So as it points to this case, the offer is we will give you credit. We'll give you a computer, and the consideration is you will pay us for that computer. Yeah, but the question is about consent, and there has to be informed consent, correct? Well, not according to the statute. Then how could there be express consent if it's not informed? Your Honor, the FCC has said prior express consent means in the business context, if you provide your cell phone number, you are providing consent to be contacted. Would the person who provides that information expect to receive that they consented to this numerous auto-dialed call from the creditor? That's a fair expectation? It is, Your Honor. In fact, the FCC specifically spoke to that, and what they said was. Where did they speak to that? Tell me where they said that that was acceptable in the debtor context. Indeed, in the 2012 report and order, they specifically don't rule on the issue because they don't have enough in the record in front of them. On this very point, so why isn't it fair to construe from all the other rulings of the FCC that the express consent can be provoked at some point? Your Honor, there is a specific quotation, and I'm looking for it right now, where the FCC has said the level of frustration with regard to calls from debt collectors do not come near the level of frustration as the calls. No, they said the record didn't support it is what they said in 2012, and so they weren't ruling on that. But let's go back to the questions about informed consent. You're talking about breach of contract principles, not answering the questions about consent. No, I was trying to finish the point with regard to the breach of contract. What Ms. Gager is trying to do, Your Honor, speaking to the common law notions of contract formation, is post-contract formation, she's trying to revoke the consideration. I don't want to pay, and I don't want you to – No, she's not trying to revoke the consideration. She's trying to revoke one means of reminding her of her obligation under the contract. Part of the consideration, though, Your Honor, post-contract formation revocation. And that's what Judge Mariani is saying you can't do. And although Mr. Flitter said it's the first case of its kind, it's not the last. The Saunders case in New York very recently, there was a decision in May of this year, Your Honor, Kenny versus mercantile adjustment. Have you notified the court of that decision? Not – we just found it this morning, Your Honor. Okay, well, why don't you provide copies? We certainly will, Your Honor. Just for the record, it's the Western District of New York decided May 1, 2013, relying on Saunders, relying on Mariani, saying – Gager, that is – saying once you provide your consent in the business context, you have consented to be called using auto dialer. And, Your Honor, if you look at what Ms. Gager is arguing in this case, she's not arguing that she didn't provide the consent. She's arguing that it could be revoked. She could opt out of it according to the 2012 ruling, which Ms. Gager says is dispositive. But that's not what the 2012 ruling said. The 2012 ruling – by the way – Well, didn't she say at some point, this is not what I consented to? I – you know, it passed maybe even a reasonableness test. But she consented to be called concerning her credit. But she didn't consent to be called 40 times in three weeks. She did. Or 60 times. What if it were three times as many? This is not what I agreed to. Your Honor, Ms. Gager didn't say that. So I'm going to revoke my consent. That's not – Your Honor, that's not what she did, though. And in this particular case, again, dealing – we are not telling – What you're saying is you can never withdraw your consent. You can never revoke your consent. No, sir, that's not what I'm saying. What I'm saying is there are ways which the consent that you provided could be revoked, but not in this particular context, not under these facts, not under what Ms. Gager did. What are the ways? As I mentioned to Judge Wallace, Your Honor, the account could be finalized. And it could be paid off. And at some point you say, just like any credit card, I'm canceling my credit card. So until she pays off the debt, she is pretty much stuck with the auto-dialing no matter how many times or until she declares bankruptcy. Well, she's – she has given her prior express to be contacted in that way. That's correct, Your Honor. That's what the statute says. That's what the FCC interpreting statute says. And if you go back, Your Honor, from the 2012 – I'm sorry, from the sound bite ruling, and then you go back to the 2012 ruling where the FCC has – this is a quote from paragraph 9 of the 2012 ruling. It specifically says, because debt collection calls are not telemarketing calls, a specific exemption for debt collection calls not warranted. So the FCC has said, should we bring this in? Should we make a specific exemption? And they say, no, telemarketing calls are subject to the TCPA. Debt collection calls are a different animal. And then what the FCC also said in paragraph 28 of the 2012 ruling is, we can maintain the existing consent rules for non-telemarketing informational calls, including debt collection calls that do not contain telemarketing messages. The FCC has been consistent since the inaction of the TCPA that says debt collection calls are outside of the protections of the TCPA for the specific reasons that the party has provided express consent to be contacted. In fairness, though, I want to just make sure we read the rest of that ruling in paragraph 48, where it says, while a few commoners assert we should apply the automated interactive opt-out requirement to both non-telemarketing and telemarketing, we decline to do so at this time because the record does not reveal a level of consumer frustration with such calls equal to that of telemarketers. So that thing, the FCC isn't saying it can't be done. They're just saying this record in soundbite didn't support it. Correct? That is what it's saying, Your Honor. But what it also says, we therefore eliminate the automated interactive opt-out requirement that we adopt today to automated or prerecorded telemarketing calls. But that doesn't mean that the FCC wouldn't, by reasonable inference on a proper record, reach an identical conclusion on debt calls. Correct? I don't, Your Honor, very respectfully, I don't believe that's the case. And here's why. From the 1992 ruling through the 2012 ruling, debt collection and revocation have always been at issue. And the FCC has consistently held that debt collection calls are exempted from here. And what the FCC has also said in the 2012 ruling is, or I'm sorry, in the soundbite decision, it specifically noted that they weren't, in no time in the past nor now are they dealing with revocation. With respect to this absent instructions to the contrary language, if I could just finish this question. I have another one too. We can ask questions as long as you want. Oh, awesome. Great. I'm sure you're very excited to know that. I've just learned that fact. I'm very excited as well, Your Honor. On the absent instructions to the contrary language, your argument is that if the applicant doesn't say don't call me at the time of application, they can never say it again, am I correct? According to the statute and according to the FCC interpretation, that's correct, Your Honor. It's a temporal limitation. But to real time, the minute the person applies for credit. But we'll go back to your client and your client interacting with the plaintiff and suggesting that let's have a credit arrangement. If she said, oh, look, don't call me, there would have been no deal, correct? Well, I don't know that, Your Honor, but that's what's so important because it gives the party who's going to or may extend the debt the option of saying, yes, we'll do it. So the risk. But didn't you just answer one of the other questions that that was part of the consideration? If they form the contract, that's correct. But if the person says, listen, I'm giving you instructions now, please don't call me at this number, there would have been no contract, correct? So doesn't it only make sense that these instructions be given at any time? No, Your Honor, but what I said was it was part of the consideration. So the other part, of course, is payment. So what I'm saying is if you give instructions to the contrary at the beginning, the bailiff in this instance can say, okay, we're not going to enter into this contract. We may never get paid. But they may also say, okay, we're willing to take the chance. We'll give you $2,500. Wouldn't it be more helpful to do all that if there could be an actual conversation, not just a writing of a number? And put differently, later in the business relationship, actual calls by a person through a manual dial. Then you could have these dialogues. There is no dialogue here. This is all online, right? That's correct, Your Honor. Consistent with business practice, not just of Dell, but of, you know, any, you know, call. I'll defer to Judge Roth now. Thank you. Okay. Arguably, we owe Chevron deference to the FCC's determination that there is express consent. And there has been no argument otherwise in this particular appeal. But what is there that says, what is there, if anything, that says we owe Chevron deference to the never revocation argument that you're making? Well, under Chevron, Your Honor, and you're correct, of course, that deference is due to what the FCC has said as the body charged with interpreting this statute. But I don't think that never revocation is what the FCC has interpreted with regard to – Well, what have they said about revocation? Anything specific? Well, as the Soundbite decision makes clear, Your Honor, they really haven't discussed revocation in this context. They've discussed it in terms of opt-out in the telemarketing sense, and they've discussed it in other senses. But, Your Honor, I think that's quite telling, because the FCC certainly could have in any number of these 92, 05, 08, 2012 Soundbites said revocation can happen at any point in the future. But at no time, and again, I believe it's quite telling, Your Honor, that of all the times the FCC has had to deal with this, it's never dealt with it. Maybe it didn't have the facts and circumstances that occur in a case like this. It didn't have the number of phone calls that may be considered abusive invasions of privacy and border on badgering. Well, but take, for example – As you would in the telemarketing sense. And take, for example, the Soundbite, Your Honor, which was a class action involving, as you say, many, many calls. And again, the FCC in dealing with Soundbite has said not that you can revoke consent in all circumstances. It certainly talked about opt-out in the telemarketing sense, referring to its 08 order, where it said what can be opted out from and debt collection is not among that, and then went on to say you can opt out in the telemarketing sense. But it didn't speak to, as Your Honor is suggesting, what's harassing, what's too many. Is five enough? Is 500 too many? So, Your Honor, at this point, the FCC, which is, as Judge Roth said, allowed deference, we don't have that in front of us. Okay, good. Thank you. Mr. Fletcher? I would first like to address the comment that I somehow misquoted the 2008 ruling or gave an impression contrary to what it says. I don't like to quote, so I'll just point to in the 2008 ruling at paragraph 8, the commission specifically says that the ACA maintains that the TCT was enacted for telemarketing and not to recover payments, and recovery of payments is not telemarketing. So that issue was teed up in the 2008 ruling. The commission at paragraph 11 said that we reiterate that the plain language of the Act, A3, prohibits the use of autodialers to make a call to any wireless number without prior express consent. We note that this prohibition applies regardless of the content of the call and is not limited to calls that only constitute telephone solicitations. So that is precisely what it says, and I believe that is what I said to the panel when I was up in my time. Your claim is a civil claim under the statute. It is, Your Honor. Are you able to make a claim, given that your client did not disclose that she had a cell phone? Yes, Your Honor, and that is because the FCC has spoken to the issue, and we talked about it a little bit earlier, that is to say that there is no good faith defense, if you will, to violation of the Act, that the callers are expected to check commercially available software periodically, I think it's every 15 days, to assure themselves that it's not a wireless number. And the FCC in the 2003 ruling specifically declined to not apply the caller's responsibility. It's the caller's responsibility. Make sure that I am calling a cell phone. Yes. And I should think that we're asking the matter to be reversed. Well, you say something I didn't realize, but you have the technology available that will make that distinction. Yes, and that spelled out clearly in the 2003 ruling. And I should think we're asking the matter to be reversed and remanded, and I should think that on remand Dell can raise an issue about willfulness because there's a $500 damage or $1,500 if it's willful, and I should think they could make a factual argument that it wasn't willful because they didn't know it was a wireless line. Where that will go, I don't know. But we state a claim. That's a separate issue from whether we state a claim for violation of the Act. Something came up about the Fair Debt Collection Practices Act. Most of the cases that have come up in this context have been both. They've been calls by debt collectors. Dell is not a debt collector. They're a creditor, so they're simply not covered by the FDCPA. And Mrs. Gager has no remedy under the FDCPA, and that's why we're here. With regard to the issue of the FCC hasn't talked about revocation of consent in the debt collection setting, while I would agree with that, I think that may well be it hasn't presented itself because it's, in my mind, it's so obvious. In virtually every area of law, and this is deemed to be a statutory tort, in every area of law and the area of tort and permission and license, it's revocable. Who would have dreamt before this case there hadn't been a decision ever holding it wasn't revocable? And that's kind of where the soundbite decision comes in, and I'd be remiss if I didn't take a moment on that. Soundbite, now it did deal with texts, but texts are deemed the same as calls under that ruling. The commission said that subsumed within the idea of consent is a concept of revocation. That's all part and parcel of what can – it's a package of what consent is. And that in that case – Of course, once you consent to enter into a contract and you consent to certain provisions, you can't just walk away from them. I would agree with that, Your Honor, but I would answer in two ways. First off, the contract's in this record and the contract is silent. Dell never said a word about autodial. They never said a word about wireless phones. So there's no contractual provision here regarding the calls that Ms. Gager breached. Other than that, I think the commission will speak to whether you can still revoke as a matter of statutory right or regulatory right, even if there is a contractual obligation. But in Soundbite, the commission held that consent is revocable and that it may be – and that once the consumer expresses a revocation of consent, thereafter, all the caller can do is send a single text message if within five minutes confirming we got your opt-out, your revocation, we won't call you anymore. Other than that, the consent's being revoked. So Soundbite is really dispositive of this appeal. We estimate it to be reversible. Mr. Flutter, thank you very much. Mr. Galea, a very well-argued case. Thank you. We'll take it under advisement. Thank you both. Your Honor, I know that my time is up. Of course. Well, why don't you send it to the clerk and the clerk will in turn send it to us. We'll take a look at it. Very well. Thank you, Your Honor. Thank you. We'll call the next case. I'm ready. U.S. v. Tyler. Mr. Krause, good morning. Good morning, Your Honors. May it please the Court, my name is Ronald Krause. I'm an assistant federal public defender with the Middle District of Pennsylvania and I represent the defendant, Willie Tyler. I would like to reserve three minutes for rebuttal. Yes, Your Honor. I'd like to start with the most, what I think is the most difficult dispositive issue in this case, which is the weighing of the sufficiency of the evidence concerning the investigation-related offenses under the Fowler Standard. I think my brief did a disservice to the Court because I don't think it fully analyzed the Fowler Standard properly as it applies to this case. I would like to expand on that analysis this morning. With the Court's permission, although I hesitate to read quotations during argument, with the Court's permission, I'd like to read three sentences from the Shavers case, which I think are very critical to this argument and that discuss Fowler. In Shavers at 378, the Court says, The federal prosecution in Fowler arose after Charles Fowler shot a police officer who caught him and his associates suiting up to rob a bank. It was clear that Fowler had shot the officer with the intent to prevent him from speaking to other law enforcement officers, but that he did not have any specific law enforcement officer or set of officers in mind at the time. To satisfy the federal nexus requirement in such a situation, the Court held, the government must demonstrate a reasonably likelihood, and you know the rest, of communicating with a federal law enforcement officer. The problem in my brief is that I focused on analyzing that third sentence, the reasonable likelihood standard, as if that were the entire Fowler standard, but it's not. It's actually the second part of a two-part standard. Fowler is two-part and it's actually the second part, it's actually the second sentence I read that states that first part. And it's that first part, it's a threshold part of the Fowler standard that's critical in this case, not the reasonable likelihood test. Now, again, I'll ask you... Say that again, what is that first part? I'm sorry, the second sentence in Shavers states the first threshold part of the Fowler standard, which is, with your permission, I'll read that from Fowler. This is from Fowler 250. What then must the government show to prove that such a defendant, meaning Fowler, who shot the officer, intended to prevent communications to federal officers? First, the relevant question concerns the defendant's intent. The government will already have shown, beyond a reasonable doubt, that the defendant possessed the relevant, broad, indefinite intent, namely, the intent to prevent the victim from communication with unspecified law enforcement officers. Didn't in Tyler, the second trial in Tyler, and in Bell, on very similar facts, there's already been finding a sufficiency of evidence on that very point? Well, Bell did address that. I think if you read it, it's a little bit superficial, first of all, as I'll explain further. But in Tyler too, though, after Tyler's second trial... The government looked at the sufficiency of the law enforcement conviction. Well, it did, but it didn't do it under the Fowler standard. But you just said that we should look at the very first part of Fowler, and didn't the court's examination of the trial record comport with that very requirement? No. No. The court in Tyler used the Bell standard. The Bell standard is proof that the officers whom the defendant believed the victim might in fact be federal officers. So the emphasis under the Bell standard is who the victim might communicate with. There's really not much emphasis on what the intent of the defendant was. And what the distinction in Fowler is, and this is what I missed on the first go-around myself... I think it was on the panel in Fowler, the 11th Circuit. The 11th Circuit decision in Fowler got overturned. I think I was on that panel. Oh, okay. Poor guy sitting around a graveyard. Right. Yeah. Right. Well, in that case, there was no question that when the local sheriff came up to the car, and they were sitting in the cemetery around the car preparing to rob a national bank, that they were shooting this officer with the intent of preventing him from communicating with other law enforcement officers, because that's obviously what another law enforcement officer would do. But that really distinguishes the facts of Fowler from this case. And also, the new emphasis in Fowler on the defendant's intent is what's really the difference here. So what Fowler instructs with its threshold standard is that you have to weigh the sufficiency of the evidence in this case under those two elements. First, that the government proved beyond a reasonable doubt that the defendant, Tyler, possessed a broad indefinite intent to prevent the victim from communicating with law enforcement officers in general. And then, show the reasonable likelihood that it would be a federal officer. Well, obviously, the reasonable likelihood standard, it wasn't addressed, I believe, by the district court in this case. It was not addressed by the trial court in this case at any time? Or was it? I'm blanking on that. I'm blanking on that, Your Honor. I am, too. I thought you might help. But let me ask you this. Should that be a jury question? Or is that something that we can address on appeal? Well, I think it certainly is a jury question. Is that part of the instructions to the jury? It is. Whether there's a reasonable likelihood that the person who was assaulted or attacked would be a federal officer? Well, there were instructions. The communication would have been made to an officer, I should say. There were instructions that didn't use the phrasing reasonable communications. I mean, reasonable likelihood. Because that wasn't the standard at the time. It was somewhat similar. I did not really go into that because I think at this point in the litigation, 2241, I don't think jury instructions are something I can attack. It's really a matter of establishing a lack of criminal conduct at this point. But that is the standard of the felon. It's the second part of the standard that you're telling us. Yes, it's reasonable likelihood. Yes. But my question is, is that a jury question? We determined that a reasonable juror could determine that there was a reasonable likelihood. I think that's clearly a jury question. And a jury has not decided that question. No, it hasn't. Not under that standard. But I would submit that this case really doesn't even get to the reasonable likelihood standard because it doesn't pass the threshold of an inference of a reasonable doubt that Tyler intended to stop Proctor from communicating with a law enforcement officer. Let's go back to the jury instructions. I understand you can't attack them. But one of the instructions the district court gave to the jury was that they act, either the physical force or the killing, was motivated by a desire to prevent the victim from communicating with law enforcement. So the jury was already told that had to be the motivation for the action. Therefore, this jury happened to have been instructed on the very point that you say was the first part of the Fowler analysis. Right? So that really isn't anything we need to be concerned about. Well, I don't think it was emphasized in the same way as it was emphasized in Fowler in terms of his intent to speak in any general, broad, indefinite sense. Certainly Fowler wasn't the law of the land at that point, and so there wasn't a focus on it. Looking at the Fowler opinion, and Justice Breyer wrote the opinion, he said, and the question that concerned the court according to Justice Breyer is, the question before us concerns what, if anything, the government must show beyond this broad, indefinite intent in order to show that the defendant were particularly intended to prevent communication with federal officers. What beyond this broad, indefinite intent? So intent was not really what they were focusing on. It's what beyond intent, and then he goes and says, we hold that in such circumstances the government must show that there was a reasonable likelihood that a relevant communication would have been made to a federal officer. So it's that second part of the problem. I'll respectfully disagree, Your Honor. The language that Fowler starts off with says, first, the relevant question concerns the defendant's intent. And then talks about how the government has to show, beyond a reasonable doubt, that the defendant possessed a relevant, broad, indefinite intent to prevent the victim from speaking to law enforcement officers. If you go immediately to the reasonable likelihood, I think I put this in my brief, you're putting the rabbit in the hat already. What Fowler did was take the rabbit out of the hat and make the government prove that there was, first, the broad, indefinite intent to prevent communication with law enforcement. Question, wasn't that already shown in prior proceedings in this case? I don't believe so, Your Honor. As an example, let's look at three very bad facts that were in the government's case, bad facts against Tyler. Look at them in the light most favorable to the government, and they were all mentioned in the government's closing. For example, on April 20, 1991, which was the day before David Tyler's trial, the day of the killing, the whole Tyler crew gathered at Mary Hodges' house. Wanda Campbell testified at the trial that David Tyler had a shotgun. He asked Willie to show him how to cock it, and Willie showed him. Now, that testimony clearly supports the inference that Tyler acted with an intent to stop Proctor from testifying at state trial, but says nothing about whether or not he had an intent to prevent her from speaking to law enforcement in general. During that same gathering, Wanda Campbell testified, David Tyler said, pardon my language, the bitch has to die tonight, the bitch shouldn't have told on me. Again, testimony, certainly a jury could use that to infer that Willie Tyler wanted to prevent Proctor from testifying at trial, but it says nothing about preventing her from communicating with a law enforcement officer. Then a few days later, after the death, Laura Barrett testified that she overheard a conversation between Roberta Bell and Tyler, which went something like this. Bell says, I shot her, but Willie killed her. And Tyler says, keep your mouth shut because you don't know who's listening. Again, inference that he intended to kill, prevent Proctor from testifying at state court trial, but says nothing about preventing her from speaking to law enforcement officers. But the entire record demonstrates that there was, and that apparently these folks knew that she had begun to cooperate with law enforcement. I don't think there's any evidence of the record that Tyler knew what was going on. He had no idea. I see my time is up. The circuit's already found that there was sufficient evidence that there was communication with law enforcement that would have been federal had she survived to communicate it. I think that's already been found, and in any event, on 2241, we have to find no reasonable juror would have concluded the way that you say it should not. But again, I think when you read that closely, what they were looking at was the reasonable likelihood standard. They didn't break out the threshold question of broad indefinite intent to look at a law enforcement officer. This isn't a case where Tyler saw Proctor talking to a detective on the street and said, I've got to stop her from talking to law enforcement. It wasn't a case where she went into, they saw her going into police headquarters, and they said, we've got to stop her from talking to law enforcement. It wasn't a case where someone told them, she's snitching on you, and you have to, and then decided, well, we have to stop her from talking to law enforcement. They had no idea she was talking to law enforcement. She had already testified. Let me ask you another question about the procedure we're in right now. If we should happen to agree with you on either the Arthur Anderson claim or the Fowler claim, then the issue remains, is there an adequate showing of actual innocence? And should we remand to the district court to determine whether there was an actual showing, whether there was a sufficient showing of actual innocence? And if so, what is the standard? Well, I think the court under 2243, it says the court shall hear and determine the facts and dispose of the matter as law and justice requires. I think you have the discretion to decide that here. If you wanted to remand it to the district court, obviously that's something you could do. Was it pointing your brain that the crime of conviction is no longer a crime? Yes. And so that would be a miscarriage of justice? Yes. Is that your point? Yes. But the district court said I don't have jurisdiction. If we should say, yes, you did have jurisdiction on the face of the complaint pursuant to the Arthur Anderson ruling and the Fowler ruling, should we then send it back to the district court to make a factual determination that there is actual innocence? And if we do, what is the standard? Well, we should tell the district court to follow. I'm not sure I understand what you mean by the standard. Well, what is actual innocence? Let me tell you, in the related, there are related arguments about actual innocence in habeas and there is a standard which we have used in related habeas petitions to determine if there is actual innocence. Should we refer to that in our instruction to the district court? Well, I think the actual innocence would be that he did not violate the witness tampering statute. Right. But that requires some factual determination and the facts of the case really haven't come before us as to what was the intention, what could the jury have decided. So it would appear to me, and I'm not saying that it would appear to my colleagues, but that there are some factual determinations that still need to be made under the Arthur Anderson and the Fowler standards to determine if there is actual innocence because the law has been changed and what was shown did not create a violation under that law and what guidance should we give to the district court? We certainly would be agreeable to sending it back to the district court and I think the guidance would be to follow the standards under Arthur Anderson and Fowler. And I don't disagree with Judge Roth's point, but I'm wondering if this is a jury issue or if this is a judge issue. For the district court? For the district, yeah. I mean, what's your position? We're talking about making factual determinations with respect to likelihood of communicating with federal officers and things like that. It seems like a factual issue to me, Your Honor. Okay, we'll kick it around, I guess. Mr. Zubrod. Thank you, Judge Fuentes. May it please the court, my name is Gordon Zubrod. I'm an assistant United States attorney. I represent the appellee in this case, the United States of America. If the court will just tolerate me for a moment to state what I think is the core issue that disposes of this matter, I'd suggest to the court that we begin with the fact that this court has already found that the facts of this case were sufficient under law to establish a nexus for a law enforcement connection under the law enforcement communication of the law enforcement officer prom. In the Bell case, the court said that the facts met the legal... Was that before Fowler? Yes, sir, it was before Fowler. But it said it met the legal and factual requirements and statutory requirements to establish the federal nexus. If you find that the law enforcement prom has been satisfied, since this was a general verdict under the United States v. Griffin case, the Supreme Court case, that means that if one object of the statute that is being charged, if they charge multiple objects, if there's a general verdict, then if one prom or object of a charge is legally sufficient, you can ignore the other ones. And we stand on the fact that under Fowler, the law enforcement prom was met because the Bell case was met. I couldn't help focusing on Proctor's testimony at Hodge's trial in January 1992. She was unwilling to cooperate anymore. Detective Fonza's testimony on multiple occasions that there were no plans at all to use Proctor to testify in any federal proceeding. So how do you find a nexus? Well, the nexus is when you look at the testimony of Proctor and of Fonz at the preliminary hearing in the state court, and you look at Fonza's testimony at the federal court, what Proctor was saying was, I'm not doing any undercover work anymore. I'm no longer working. But it was clear from Detective Fonza's testimony that it wasn't his call where it went from there. He was part of the federal joint task force. The best testimony is that there were no plans at all to use Proctor to testify in any proceeding. Well, if you look at page 338 of the testimony, Detective Fonza says, basically, Detective Fonza says that, he said that, he said the next step would have been to evaluate the information that Proctor had provided in order to see if further investigation was warranted. It was the duty of the task force coordinator, Agent Diller, to make that determination. Well, from that, I would conclude that maybe Proctor's work might have been communicated to federal officials, possibly, perhaps. It was. But that's contrary to the felonies. Your Honor, it was communicated to the federal officials because Agent Diller was the representative and the advisor and counselor of the federal government, and he had interviewed her prior to her being murdered. And he had said that she had told him about multi-jurisdictional involvement of this drug organization, and that he had arranged that he was going to meet with her and debrief her. Fonz, when he was asked, what information did she tell you about multi-jurisdictional activity, he said they traveled to New York and traveled to Jamaica to set up drug transactions. So you have not only multi-jurisdictional, you have multi-state and multi-national. Agent Diller said, I would have communicated that. After my interview, following up on my follow-up interview, I would have communicated that to the DEA. The DEA took the stand and said, we absolutely would have taken this case and she would have been a witness and we would have taken on this investigation. So you're saying based upon that proper set of facts from this trial record, the trial record not only substantiated the conviction as already found to be sufficient as a matter of evidence in Tyler, the second trial, the second trial and appeal, but also under Fowler. You're saying there's enough evidence here that the court could find that it would have made the Fowler test too, because there was not just a reasonable likelihood, but a very strong likelihood. Yes, and remember, I do, Judge Schwartz, but remember that the Fowler said that when you talk about reasonable likelihood, it's not beyond a reasonable doubt. It's not even more likely than not. It is more than remote or hypothetical. And when you have, as they found in the Bell case, they said she was already communicating with law enforcement officials in a partially federal drug task force. It was reasonable to assume, based upon the testimony, that she was going to continue communicating with law enforcement officials. The federal law enforcement officials said he had already set up to meet with her. And it said that a jury could have reasonably inferred that at least one of those communications would have been to a federal official. And Diller says, I'm the guy. Are you conceding the Arthur Anderson prong? I'm sorry, do I see? Are you conceding? Well, I would have to say, Judge, that the official proceeding prong of the indictment is our weaker argument. But the Arthur Anderson case does not apply to Todd. It doesn't apply, first, because it referred to official proceedings and we're going under the law enforcement prong. As the district court found, citing cases from the 6th and 11th Circuit, that Arthur Anderson does not apply to law enforcement prong. But even more importantly, Arthur Anderson can never apply to tampering with a witness by murder. Because Arthur Anderson was concerned. How did the defendant know that what he's doing is wrong under Arthur Anderson? Well, the official proceeding, it has to be a federal official proceeding, right? Under Arthur Anderson, it has to be in contemplation. If it's per se legal activities, it has to be in contemplation. I'm talking about the language of the statute. Your proceeding must be a federal proceeding. Yes. Official proceeding. Yes. And there's no official federal proceeding that was extant or conceived of at the time that the murder of Ms. Proctor occurred, right? That's correct. So are you conceding that prong of the... Well, we're certainly hanging our spurs on the law enforcement prong. I would say that that is our weaker one. Actually, the piece of evidence was the DEA agent said not only would she have been part of our investigation, we would have used her as a witness. Didn't it matter that she said she was just not going to cooperate anymore and said so at the Hodge trial? She said in the Hodge trial that she had been burned as an informant. She was no longer to be working as an informant. And frankly, it's not her call. But she understood... She said, I am not going to cooperate anymore. I'm done. Well, we don't judge the presence of a potential communication with a law enforcement official by the decedent. It is, was the evidence, was it likely that there was sufficient evidence shown that she was going to be communicating with someone? The investigative prong rather than the official proceeding prong, right? That's correct, Judge. And she could have said, I'm not going to talk to you anymore when the federal law enforcement officer came to her. She's still communicating with the federal law enforcement officer. I just want to go back to you. I think you were about ready to say something about Bell and the court in Bell acknowledging that there did not appear to be sufficient evidence of an official proceeding. Yes. Did you have to say that? Yes, Your Honor, I did say that. So from your point of view, Arthur Anderson really doesn't change that at all, that the state of the evidence is what it is, and whether it was an official proceeding as defined by Arthur Anderson or an official proceeding as applied by Bell, it doesn't matter. The state of the evidence remains the same. The state of the evidence points to law enforcement communication prong, and that's where we stand. And I would emphasize to the court as well that we're looking at this under the 2241 standard. One of three things has to be established by the defense to carry the day in this. One, actual innocence. Two, the statute was decriminalized or the conduct was decriminalized. Under the law enforcement standard it wasn't because as the defense conceded before you, as my colleague conceded before you, he did commit the murder. There's plenty of evidence to show that he put the gun to her head and killed her. Well, he was acquitted of homicide, right? No, he was convicted of homicide, tampering by homicide in the federal court. Yeah, in the state court he was acquitted of homicide. He was acquitted under the state law of conspiring to commit homicide. The third that the defense has to carry is that no reasonable juror, could have found the evidence was sufficient to convict beyond a reasonable doubt. None of those things have been shown in this case. Judge Roth asked your colleague about remand. Do you think that's necessary and if not, why not? I do not. First of all, the district court addressed Fowler and addressed Arthur Anderson and said under both of those, first of all, Arthur Anderson doesn't apply, but Fowler, the reasonable likelihood when you look at all of the evidence, and there are I think nine key points cited by the court, when you look at all of the evidence, there was a reasonable likelihood that she would have communicated at least once with a federal law enforcement officer, that is Agent Diller who met the standard under 1512. She would have. She did not, though, communicate with any federal officer. She did communicate, Your Honor. She communicated with Agent Diller. Agent Diller was… Was Diller a federal official? Under the statute, he was. Well, he was a state law enforcement officer who was part of the committee and had an official position with the committee, right? Well, here's what the statute says. The term law enforcement officer means an officer employee of the federal government or a person authorized to act for or on behalf of the federal government or serving the federal government as an advisor or consultant. Both the head of the Pennsylvania Bureau of Narcotics Investigation for the Pennsylvania Attorney General's Office and the representative of DEA testified this was our advisor, this was our consultant. He decided what cases went federally. As a matter of fact, Diller testified that he was the case agent in the federal trials. I tried cases with Mr. Diller before he retired. He was a federal agent under the statute as the advisor, consultant, and DEA when, for instance, he makes the decision as to whether or not we take the case for federal prosecution. So the answer is yes. And Diller said, I interviewed her beforehand and she told me of multi-jurisdictional involvement and I intended, and Phones confirms that, I intended to interview her after her testimony when they had finished the state case, the local case, to discuss with her the other involvement. And that involvement was not just multi-jurisdictional, it was multi-state and it was multi-national. Now the actual innocence, the case that I, Bowsley is the case. Bowsley. Which, if we should, if we should decide that it should be remanded and question determination made by the District Court of Actual Innocence, is the Bowsley standard the one we should use? Is that relevant? I believe the Bowsley standard is relevant, Your Honor. When we come to actual innocence, though, remember that the court is not to consider jury instructions or anything else. It is actual innocence. And when the representative of the defendant, the appellant, stands before you and acknowledges that the evidence was sufficient on murder, then it is to look at all of the evidence for this court to consider all of the evidence of the case, as the district court did below, and say, based upon all of the evidence, there was a reasonable likelihood that at least one communication with a federal law enforcement officer would have occurred had she not been murdered. And one of the reasons, he said, that in the Bell case, they pointed out, and the court followed up on Bell, when you, these people were well aware that their involvement went far beyond Carlisle, where the prosecution was taking place for sales that took place within Cumberland County. They were well aware that it went far beyond that. It went beyond the bounds of the jurisdiction. It went beyond the bounds of the state. It went beyond the bounds of the United States. They were aware that if she continued to cooperate or communicate with law enforcement, that would come out. And the court said that there was plenty of evidence in there in Bell that there was going, that it was a partially federal law enforcement task force that was involved. And if she had done any more communication with him, the reasonable likelihood is that at least one of those communications would be with a federal law enforcement officer. And Fone said, if it had already been planned, that I was going to turn the case over to Detective Diller and he would continue the interview. And Diller had already begun the interview before she had been killed. That's, you have to find that no reasonable juror could have found that evidence was sufficient beyond a reasonable doubt on those facts. And we submit that the evidence is there and that there is no clear error in terms of that. Those were reasonable inferences from the jury. And therefore, since none of the prongs of 2241 have been met, we ask the court to uphold this. Thank you. Mr. Krauss? Well, first, addressing Mr. Diller's status as a federal agent, it's significant if you go back, this case, as you well know, has a history way back into the 90s. And Mr. Diller testified numerous times. It was only in the last trial where all of a sudden Mr. Diller decides that he is an advisor and consultant for the federal government. And when asked where he got that phrase, I believe he said something like, well, I think I got it off of someone's affidavit or someone else's memorandum. It was clear that this was manufactured solely for the purpose of tracking the statute. Was he a member of a task force? He was a member of a task force. But in 1992, there were no federal members of that tri-county task force at that time. Was it a joint federal state task force at the time or what? Well, my understanding was that it was a tri-county task force. The roster is part of the appendix. You'll see no federal names in it. You'll see no federal agencies in it. The testimony of Pagliano says there was no federal involvement in it. Basically, what it was was Mr. Diller, who was sort of the liaison with DEA and other federal agencies, he had their phone number on his Rolodex. That was basically his connection to the federal government. When occasionally a case that he thought might introduce the federal government would come up, he'd call them up and then they would think about it. But one of the things that's significant in this case is Diller supposedly had this conversation with Ms. Proctor, where they got into Harrisburg as this great hub of international drug smuggling and going to Jamaica. And yet he didn't do anything about it. This was January 1991. He didn't do anything about it. He didn't call up the DEA. He didn't call up Mr. Zubrod and tell him, hey, I have somebody here. I think there's a multi-jurisdictional issue. They say they were going to wait for the state court proceedings to end. Does that make any sense? If there was some matter that the federal government would be interested, the federal government would step in. The state would null the prosecution. Mr. Zubrod would step in, and he'd take over, and he would have gotten the convictions. The idea that this was any really federal interest doesn't come up, and it never came up until after Bell was acquitted. Let me ask you a question. Mr. Zubrod talked about this being a general verdict, and therefore if any charge is valid, that's the end of the case. Do you agree with that? I don't see how that could be. I think he asked, there has to be guilt on each of the charges and each of the elements of the charges. I don't understand. We certainly have to see what the verdict slip looked like. Is that in the appendix? It's not, and actually we looked for it and couldn't find it. So what we have about the verdict, though, is in the section of the jury charges, the reading back by the court proceedings. It might be there, but still, it seems to me that we have to have guilt on each element of the charge. Mr. Cross, thank you very much. Thank you. Thank you for your excellent argument. And please, the court, I have the jury verdict here, the verdict slip here, which we turned over, we found it last week, and we turned it over to the defense. If the court would like it, we would turn it over to the court. Give it to the court, and we'll take a look at it. If that's fine. And we are citing for our position the United States versus Griffin. Thank you, Mr. Zubrow. Thanks. Thank you. We'll adjourn. All right, thank you. All right, we'll adjourn until 1 o'clock. Thank you. Congratulations. Good night. Good night.